IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

W. SILVER RECYCLING, INC.,     )
    )
    Plaintiff,     )
    )
v.     )     NO. 3:18-cv-00710
    )
PROTRADE STEEL COMPANY, LTD.,     )     JUDGE RICHARDSON
    )
    Defendant/Third-Party Plaintiff,     )
    )
v.     )
    )
SOUTHERN RECYCLING, LLC,     )
    )
    Third-Party Defendant.     )

## MEMORANDUM OPINION

Before the Court is Third-Party Defendant Southern Recycling, LLC's Motion to Dismiss the Third-Party Complaint (Doc. No. 22, "the Motion"), supported by an accompanying brief (Doc. No. 23). Third-Party Plaintiff, ProTrade Steel Company, Ltd., filed a response (Doc. No. 27). Thereafter, the Court directed the parties to the Motion[1] to file, and they did file, additional briefing on the following issue(s): Whether the Uniform Commercial Code governs the allegedly breached contract, and if so, how the applicability of the Uniform Commercial Code affects the analysis of the Third-Party Defendant's Motion to Dismiss. (Doc. Nos. 36, 39). For the below stated reasons, the Motion will be denied.

---

[1] Plaintiff, W. Silver Recycling, Inc., is not a party to the Motion.

# FACTUAL BACKGROUND[2]

ProTrade Steel Company, Ltd. ("ProTrade") is in the metals brokerage business and frequently enters into contracts to purchase scrap metal from a company, planning to sell the material it purchases to other companies in need of such metal. (Doc. No. 13 at ¶¶ 1-2 ("Third-Party Compl.")). Southern Recycling, LLC ("Southern") operates metal processing facilities in Nashville, Tennessee and Bowling Green, Kentucky, as well as a barge loading facility in Clarksville, Tennessee. (*Id*. at ¶¶ 3-4).

ProTrade entered into a contract with W. Silver Recycling, LLC ("W. Silver"), which provided ProTrade would purchase from W. Silver the contents of Barge # AEP 7232 ("the barge"), approximately 1,302.27 gross tons of scrap metal, at a price of $335 per gross ton. (*Id*. at ¶ 9). The scrap metal consisted primarily of metal busheling, which previously had been rejected by a steel mill in Mobile, Alabama. (*Id*. at ¶ 10). Before attempting to find its own buyer for the scrap metal, ProTrade inquired as to the reason for the steel mill's rejection of the scrap metal. (*Id*. at ¶ 11). W. Silver informed ProTrade that the steel mill rejected the scrap metal only because some of the busheling was "oversized." (*Id*.).

---

[2] The cited facts are alleged in the Third-Party Complaint and accepted as true for purposes of the instant motion to dismiss.

On August 29, 2017, ProTrade entered into a contract ("8/29 Sale Contract")[3] with Southern for ProTrade to sell to Southern the contents of the barge (purchased from W. Silver) at a price of $365 per gross ton delivered. (*Id*. at ¶ 8). By selling the materials purchased from W. Silver to Southern for a higher price, ProTrade expected to profit approximately $9,168.03. (*Id*. at ¶ 9). The 8/29 Sale Contract incorporated ProTrade's Terms and Conditions. (*Id*. at ¶ 15). The Terms and Conditions warrant only that the material will conform to the description on the face of the contract "with variations in size, composition, and quality consistent with norms in the trade." (*Id*. at ¶ 16). The Terms and Conditions specifically disclaim any other implied warranties. (*Id*.).

After the 8/29 Sale Contract was entered into, ProTrade proceeded to transport the barge from Mobile, Alabama to Clarksville, Tennessee. (*Id*. at ¶ 18). While the barge was in transit, the market price for metal busheling fell by approximately $40 per gross ton. (*Id*. at ¶ 20). The barge arrived in Clarksville on September 22, 2017. (*Id*. at ¶ 21). On September 28, 2017, Southern informed ProTrade that it was rejecting the scrap metal materials on the barge. (*Id*. at ¶ 22). ProTrade inspected the materials and informed Southern that it believed its rejection was improper.

---

[3]

**ProTrade Steel Company, Ltd**.
5700 Darrow Rd #114 · Hudson, OH 44236
Telephone (330) 655-3970

**PROTRADE STEEL**

**Sale Contract**

Contract Number: **603939**

Contract Date: 08/29/17
Shipment By: 09/30/17
Your Order No.: SR151220

Payment Terms: NET 30 DAYS
F.O.B. Point: DELIVERED
Our Representative: JEFFREY A ZIMMER

AGREES TO SELL TO: SOU001
SOUTHERN RECYCLING
620 CLAY ST.
BOWLING GREEN, KY  42102-1845

SHIP TO:
SOUTHERN RECYCLING
(C/O WINN MARINE, LLC)
800 BARGE POINT ROAD
CLARKSVILLE, TN  37042

| Quantity | U/M | Description | Price | U/M |
|---|---|---|---|---|
| 1500 | GT | MILL BUSHELING | 365.0000 | GT |

```
           ************************************************
           FOR BARGE # AEP 7232
```

(*Id*.). Southern indicated that it would be willing to pay $260 per gross ton, instead of the original contract price of $365. (*Id*.).

The barge of scrap metal was accruing daily additional demurrage charges as it sat in Clarksville, Tennessee. (*Id*. at ¶ 23). Due to Southern's refusal to pay the original contract price of $365 per gross ton, and W. Silver's refusal to reduce its sale price, ProTrade opted to exercise its rights under the contract with W. Silver to downgrade the materials and paid W. Silver $265 per gross ton.[4] (*Id*.). ProTrade also accepted payment of $270 per gross ton from Southern, the most Southern would willingly pay under the circumstances. (*Id*.). Another document, also entitled "Sale Contract," was issued (apparently on or after November 1, 2017) ("11/1 Sale Contract")[5] to reflect the change in price. (Doc. No. 13-2). The 11/1 Sale Contract is substantially similar to the 8/29 Sale Contract, but the 11/1 Sale Contract includes the addition, "11/1: PRICE UPDATED FROM $365 TO $270" and elsewhere reflects the change of price to $270 per gross ton. (*Id*.).

---

[4] The Complaint does not explain what "downgrade" means. The Court could speculate as to the meaning, but declines to do so.

[5]

**ProTrade Steel Company, Ltd.**
5700 Darrow Rd #114 · Hudson, OH 44236
Telephone (330) 655-3970

**PROTRADE STEEL**

**Sale Contract**

Contract Date: 08/29/17
Shipment By: 09/30/17
Your Order No.: SR151220

Contract Number: **603939**
Payment Terms: NET 30 DAYS
F.O.B. Point: DELIVERED
Our Representative: JEFFREY A ZIMMER

AGREES TO SELL TO: SOU001
SOUTHERN RECYCLING
620 CLAY ST.

BOWLING GREEN, KY 42102-1845

SHIP TO:
SOUTHERN RECYCLING
(C/O WINN MARINE, LLC)
800 BARGE POINT ROAD
CLARKSVILLE, TN 37042

| Quantity | U/M | Description | Price | U/M |
|---|---|---|---|---|
| 1500 | GT | MILL BUSHELING | 270.0000 | GT |
| | | FOR BARGE # AEP 7232 | | |
| | | 11/1: PRICE UPDATED FROM $365 TO $270 | | |

4

Southern's improper rejection of the goods caused ProTrade to accept a reduced price. (*Id*. at ¶ 24).

On July 31, 2019, W. Silver filed a lawsuit against ProTrade, asserting breach of contract, breach of implied contract, negligent misrepresentation, and unjust enrichment. (Doc. No. 1). On October 30, 2019, ProTrade filed the Third-Party Complaint against Southern, alleging breach of contract and equitable indemnity. (Doc. No. 13). On December 6, 2019, Southern then filed a Motion to Dismiss the Third-Party Complaint (Doc. No. 22) and ProTrade responded (Doc. No. 27). Now that the above-referenced supplemental briefing has been filed, the Motion is ripe for adjudication.

## LEGAL STANDARD

For purposes of a motion to dismiss, the Court must take all of the factual allegations in the complaint as true, as the Court has done above. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010); *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy

the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. Identifying and setting aside such allegations is crucial, because they simply do not count toward the plaintiff's goal of showing plausibility of entitlement to relief. As suggested above, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id*. at 681. The question is whether the remaining allegations – factual allegations, *i.e.*, allegations of factual matter – plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). However, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

## ANALYSIS

### I. Choice of law

Before determining whether ProTrade's third-party claims survive Southern's Motion to Dismiss, the Court must first address the applicable choice of law. *See, e.g., Pa. Emp., Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 466 (D. Del. 2010) (noting that before addressing

a motion to dismiss, "the Court must first resolve the choice-of-law question to determine the applicable law relevant to each [claim]"). In cases where federal courts have diversity jurisdiction pursuant to 28 U.S.C. § 1332, federal courts apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Centra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008). That means, in the instant case, of course, Tennessee.

"In determining choice of law on a motion to dismiss, courts generally examine the face of the complaint and additional documents" attached to or referenced in the complaint. *Lewis Lumber & Milling, Inc. v. Mereen-Johnson, LLC*, No. 3:17-cv-00643, 2018 WL 6181356, at *3 (M.D. Tenn. Nov. 27, 2018) (citing *In re Darvocet, Darvon & Propoxyphene Prod. Liab. Litig.*, No. 2:11-MD-2226-DCR, 2013 WL 663575, at *2 (E.D. Ky. Feb. 22, 2013) ("Because the Court was ruling on a motion to dismiss, it based its choice of law analysis on the allegations in the plaintiff's Amended Complaint.")).

In its memorandum in opposition to the Motion, ProTrade asserts that Ohio's version of the Uniform Commercial Code ("UCC") applies because a provision in ProTrade's terms and conditions, which were incorporated into both the 8/29 Sale Contract and 11/1 Sale Contract (Third-Party Compl. at ¶ 15), provides "[t]his Contract shall be governed by, and construed and enforced in accordance with the laws of the State of Ohio, without giving effect to the conflict of law rules thereof." (Doc. No. 14-2). "Tennessee will honor a choice-of-law clause if the state whose law is chosen bears a reasonable relation to the transaction and absent a violation of the forum state's public policy." *Boswell v. RFD–TV the Theater, LLC*, 498 S.W.3d 550, 556 (Tenn. Ct. App. 2016) (citing *Bourland, Heflin, Alvarez, Minor & Matthews, PLC v. Heaton*, 393 S.W.3d 671, 674 (Tenn. Ct. App. 2012)). ProTrade's Third-Party Complaint alleges that it is an Ohio limited liability company with its principal place of business in Ohio. (Third-Party Compl. at ¶ 1).

However, the parties have not briefed the issue of whether this fact alone sufficiently establishes that the transaction at issue bears a reasonable relationship to Ohio. Further, Southern does not concede that Ohio law applies. Nevertheless, the Court does not have to decide which state's law applies. The applicable version of the UCC is immaterial for purposes of resolving the instant motion because the relevant provisions of the UCC at issue are identical for both Ohio and Tennessee. Accordingly, the Court finds a choice-of-law ruling at this juncture to be premature and unnecessary in light of a lack of apparent material distinctions between Ohio and Tennessee law. *Compare* Tenn. Code Ann. § 47-9-102(a)(43) *with* O.C.R. § 1309.102(A)(43); *compare* Tenn. Code Ann. § 47-2-209 *with* O.C.R. § 1302.12; s*ee also Nat'l Bankers Tr. Corp. v. Total Quality Logistics, LLC*, No. 12-CV-02208-TMP, 2013 WL 12100719, at *5 (W.D. Tenn. Sept. 30, 2013) ("[T]he court is not aware of any material distinction in the case law interpreting Ohio or Tennessee law on contracts or the U.C.C., at least as the law pertains to the issues raised in the instant motions.").[6]

Neither party discusses which state's law governs ProTrade's equitable indemnity claim. Southern argues in its memorandum of law that the equitable indemnity claim does not survive under Tennessee law, but offers no explanation as to why Tennessee law applies to that claim. As discussed below, the Court finds that the issue Southern raises in regard to this claim is actually governed by the Federal Rules of Civil Procedure because the issue is one of procedural law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). As Southern offers just this sole procedural argument for dismissing the equitable indemnity claim, the Court sees no need to resolve which state's law

---

[6] Southern asserts that its own terms and conditions include a choice-of-law provision that states Kentucky law will govern its contracts. (Doc. No. 39 at 1). However, at the motion to dismiss stage, the Court reviews only the facts as Plaintiff alleges them in its Third-Party Complaint and any documents referenced in the Third-Party Complaint. *See Froom-Lipman Grp., L.L.C. v. Forest City Enter., Inc.*, No. 1:06-cv-185, 2008 WL 11379986, at *4 (N.D. Ohio Jan. 23, 2008) (ruling on a motion to dismiss and examining the face of the complaint to decide the choice-of-law issue). Accordingly, the Court will disregard Southern's assertion.

governs this claim and will apply the Federal Rules of Civil Procedure to resolve the instant motion with respect to the claim.

## II.  Breach of Contract

To state a claim for breach of contract, a plaintiff must plead facts that demonstrate each of these elements: 1) a contract existed; 2) one party to the contract fulfilled its obligations;[7] 3) the other party failed to fulfill its obligations; and 4) damages resulted from that failure. *Ross v. PennyMac Loan Servs. LLC*, 761 F. App'x 491, 495 (6th Cir. 2019) (citing *Quest Workforce Sols., LLC v. Job1USA, Inc.*, 75 N.E.3d 1020, 1030 (Ohio Ct. App. 2016)); *see also ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (explaining the under Tennessee law, the elements for a breach of contract claim are: (1) the existence of an enforceable contract; (2) nonperformance amounting to breach of the contract; and (3) damages caused by the breach of contract).[8] "The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." Tenn. Code Ann. § 47-2-301; O.C.R. § 1302.14. The failure of either party to satisfy this obligation constitutes a breach.

Southern argues ProTrade's Third-Party Complaint does not properly state a breach-of-contract claim because the face of the 11/1 Sale Contract lists a sale price of $270 per gross ton and ProTrade alleges in its Third-Party Complaint that ProTrade accepted Southern's payment in that amount. Thus, according to Southern, ProTrade has not pled any facts demonstrating

---

[7] Tennessee common law does not explicitly require this element (*i.e.*, that one party to the contract to fulfill its contractual obligations) in order to state a breach of contract claim. *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship, LPIMC, Inc.*, 79 F.3d 496, 514 (6th Cir. 1996). Nevertheless, the difference is immaterial for purposes of resolving the instant Motion.

[8] The UCC does not alter the common-law definition of breach of contract. *See Orlowski v. Bates*, 146 F. Supp. 3d 908, 923 (W.D. Tenn. 2015) (citing the elements of a common law contract claim when analyzing a breach of contract claim involving the sale of goods); *Wesco Distrib. Inc. v. All Phase Elec. Contractors Inc.*, No. 2:07-CV-00096, 2007 WL 9734593, at *2 (S.D. Ohio Dec. 17, 2007) (same).

Southern's non-performance (*i.e.*, breach) under the contract. (Doc. No. 23 at 4-5). In response, ProTrade argues that the face of the 11/1 Sale Contract reveals a breach because it shows (as does the 8/28 Sale Contract, for that matter) that the parties entered into the Sale Contract on August 28, 2017 and the price was changed to $270 on November 1, 2017, after the goods were delivered and improperly rejected. (Doc. No. 27 at 3-4). Thus, according to ProTrade, this is enough to show that Southern breached the original contract entered into on August 28, 2017 (*See* 8/29 Sale Contract). The Court agrees; construing the allegations of the Third-Party Complaint in ProTrade's favor, ProTrade has stated a claim based on an alleged breach of contract that occurred prior to any renegotiating of price.[9]

ProTrade could have stopped there, but it goes further, addressing in essence why its adequately stated breach-of-contract claim is not somehow defeated by the existence of the 11/1 Sale Contract. Specifically, ProTrade claims that the 11/1 Sale Contract containing the revised price is actually a second contract entered into under duress after Southern's initial breach. Construing the Third-Party Complaint in ProTrade's favor, the Court agrees that ProTrade has alleged that the 11/1 Sale Contract was entered into under duress, and thus a nullity that does not serve to impair the claim for breach of the 8/29 Sale Contract that, as the Court has found, has been sufficiently stated.

---

[9] According to ProTrade's allegations, it delivered goods that were improperly rejected and thereafter Southern refused to pay the agreed upon price of $365 per gross ton. (*See* Third-Party Compl. at ¶¶ 21-24). "The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." Tenn. Code Ann. § 47-2-301; O.C.R. § 1302.14. The failure of either party to satisfy this obligation constitutes a breach. Therefore, if Southern *improperly* rejected the goods (which the Court reads to mean that the goods were in fact conforming to the terms of the Sale Contract) and refused to pay in accordance with the 8/29 Sale Contract, it was in breach of the 8/29 Sale Contract. *See BHP Inc. v. Titan Energy Sys. Inc.*, No. 18-CV-450, 2019 WL 669965, at *4 (E.D. Wis. Feb. 19, 2019) ([Buyer's] failure to pay the full purchase price constituted a material breach of the [] contract[.]"); *Kysar v. Lambert*, 887 P.2d 431, 438 (Wash. Ct. App. 1995) ("[B]uyer who rejects conforming goods is generally in breach of contract[.]); *Gulf Coast Fabricators, Inc. v. Mosley*, 439 So.2d 36, 39 (Ala. 1983) ("[W]rongful rejection of conforming goods constitutes a breach of contract[.]").

The Sale Contract is governed by the UCC, as adopted in Ohio and Tennessee, because it is a contract governing a transaction in goods.[10] *See* O.R.C. § 1302.12; Tenn. Code Ann. § 47-1-101, *et seq*. Under both Ohio and Tennessee's enactments of the UCC, agreements to modify existing contracts are enforceable even in the absence of consideration. *See* O.R.C. § 1302.12; Tenn. Code Ann. § 47-2-209; *see also Kehoe Component Sales Inc. v. Best Lighting Prods. Inc.*, 933 F. Supp. 2d 974, 1005 (S.D. Ohio 2013); *Duffy Tool & Stamping, Inc. v. Bosch Auto. Motor Sys. Corp.*, No. M1997-00144-COA-R3-CV, 2000 WL 122225, at *5 (Feb. 1, 2000 Tenn. Ct. App.). Southern, in its supplemental brief, argues the change in price is a valid modification of the contract and that Southern performed under that contract.[11] (Doc. No. 39 at 3)

"A party's ability to modify an agreement is limited only by Article Two's general obligation of good faith." *Roth Steel Prod.*, 705 F.2d at 145. Comment 2 to UCC § 2-209 provides: "[M]odifications [to contracts] must meet the test of good faith imposed by this Act []. The effective use of bad faith to escape performance on the original contract terms is barred, and the extortion of a "modification" without legitimate commercial reason is ineffective as a violation of

---

[10] "Article 2 [of the UCC] applies to transactions in goods[,]" *Audio Visual Artistry v. Tanzer*, 403 S.W.3d 789, 796 (Tenn. Ct. App. 2012) (citing 67 Am. Jur. 2d Sales § 37), and the sell of scrap metal is considered a transaction in goods. *See Iverson Indus., Inc. v. Metal Mgmt. Ohio, Inc.*, 525 F. Supp. 2d 911, 917 (E.D. Mich. 2007) ("The parties' transactions in scrap metal is nothing more than a sale of goods, which in Michigan is governed by Article 2 of the Uniform Commercial Code."); *Am. Iron & Metal Co. v. U.S. Ferrous Trading Div., Tube City Div., Tube City IMS*, No. 306CV01538PCD, 2007 WL 1125682, at *3 (D. Conn. Apr. 16, 2007) (noting that the "scrap-metal transaction was a sale of goods . . . . Therefore, the transaction is subject to the Connecticut U.C.C.").

[11] Southern asserts that an analysis under the UCC "is not necessary for the Court to determine that Southern's Motion to Dismiss should be granted". (Doc. No. 39 at 2). Southern attempts to oversimplify something that is just not that simple. In doing so, Southern essentially asks the Court to ignore the patently evident modification of price that is displayed on the face of the 11/1 Sale Contract. Under Tennessee and Ohio common law (as opposed to the UCC as adopted in those states), material terms of a contract (*i.e.*, price) cannot be modified absent new consideration. *RotoSolutions, Inc. v. Crane Plastics Siding, L.L.C.*, Nos. 13AP-1, 13AP-52, 2013 WL 5451702, at *3 (Ohio Ct. App. Sept. 30, 2013); *Estate of Hordeski v. First Fed. Sav. & Loan Ass'n of Russell Cnty., Ala.*, 827 S.W.2d. 302, 305 (Tenn. Ct. App. 1991). Therefore, an analysis under the UCC is in fact important because under common law, absent evidence of new consideration, Southern could be considered to be in breach of the contract. *Roth Steel Prod. v. Sharon Steel Corp.*, 705 F.2d 134, 145 (6th Cir. 1983) ("The ability of a party to modify a contract which is subject to Article Two of the Uniform Commercial Code is broader than common law, primarily because the modification needs no consideration to be binding."). Southern's assertion here is surprising because an analysis under the UCC actually strengthens Southern's position, albeit ultimately to no avail (on the Motion, at least).

the duty of good faith." UCC § 2-209, official comment 2; *see also* O.R.C. § 1302.12; Tenn. Code Ann. § 47-2-209. "The draftsmen of the [UCC] . . . look[ed] to the doctrines of duress and bad faith for the main protection against exploitive or opportunistic attempts at modification[.]" *Wisconsin Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1285–86 (7th Cir. 1986) (citing UCC § 2–209, official comment 2); *see also Duffy*, 2000 WL 122225, at *5 ("Thus, a modification of a contract for the sale of goods procured under circumstances of economic duress is voidable by the victim."); *IPEC Inc. v. Int'l Lithographing Corp.*, 869 F.2d 1080, 1082 (7th Cir. 1989) (finding that "the second contract was not negotiated in good faith, as defined by the [UCC], [and therefore] it could not operate as a modification or waiver of the first contract" because "the second contract [(i.e., modification)] was obtained under duress[.]").

In *Roth Steel*, the Sixth Circuit explained that a determination of good faith involves two inquiries. 705 F.2d at 145–46. First, the court must determine "whether the party's conduct is consistent with 'reasonable standards of fair dealing in the trade' (the UCC good faith test) . . . and whether the parties were in fact motivated by honest desire to compensate for commercial exigencies," and "the party asserting the modification must demonstrate that his decision to seek modification was the result of a factor, such as increased costs, which would cause an ordinary merchant to seek modification of the contract." *Id*. The second prong of the *Roth Steel* test is the determination of whether "the *means* used to obtain a modification are an impermissible attempt to obtain a modification by extortion or overreaching." *Id*. at 147 (emphasis added).

ProTrade alleges in Count I of its Third-Party Complaint that upon delivery from Mobile, Alabama to Clarksville, Tennessee by way of barge, Southern "*improperly*" rejected the material and indicated it "would be willing to pay $260 per gross ton, instead of the contract price[.]" "Faced with Southern's refusal to pay the contract price, ProTrade was left to determine what

should be done with a barge of scrap metal which was daily accruing additional demurrage charges" which placed "ProTrade in an impossible position," that resulted in ProTrade accepting the lower price under duress. (Third-Party Compl. at ¶¶ 21-24). These factual claims, namely, that the goods were improperly rejected, and the rejection caused ProTrade to accept a reduced price, must be taken as true at this stage of the proceedings. The Court finds that these allegations suggest an "impermissible attempt to obtain a modification by extortion or overreaching" that could fail the test of good faith as set out by UCC § 2-209.[12] *Roth*, 705 F.2d at 147; *see also Am. Hosp. Supply Corp. v. Hosp. Prod. Ltd.*, 780 F.2d 589, 599 (7th Cir. 1986) ("Thus a buyer who owes money to a financially distressed seller for goods sold and delivered and withholds it in order to force a modification of the contract without fresh consideration is guilty of duress, and the modification will not be enforced.")). Whether it does fail that test is a question for another day.

It is true that ProTrade, in its Answer to W. Silver's Complaint, alleges that its own breach of contract was excused because the goods were "defective" and "properly rejected." (Doc. No. 13 at 2-3). But in its Third-Party Complaint, ProTrade alleges that there is "no excuse" for Southern's refusal to accept the very same goods. (Third-Party Compl. at ¶ 27). This type of pleading in the alternative is allowed at the pleadings stage. *See* Fed. R. Civ. P. 8(d). To be sure, as even ProTrade acknowledges, "[a]t some point in the litigation, ProTrade will likely have to decide between those two positions." (Doc. No. 27 at 4). Although that stage has not yet arrived, the Court believes a warning is warranted: ProTrade's Third-Party Complaint survives for the time being, but if it ultimately is determined that Southern was within its rights to reject the shipment

---

[12] Southern argues that parol evidence prevents any consideration of evidence outside of the contract, however, ProTrade has alleged economic duress, which if properly pled, will allow the consideration of parol evidence. *See Lowry v. Lowry*, 541 S.W.2d 128, 133 (Tenn. 1976) (noting that the parole evidence rule will not bar an attack on the basis of "fraud, misrepresentation, duress, undue influence, mutual mistake and incapacity."); *Polish v. Town & Country Auto Sales, Inc.*, No. 33292, 1974 WL 184864, at *2 (Ohio Ct. App. Oct. 3, 1974) ("It is a well-established rule that parol evidence may be admitted to show that a writing was obtained by fraud or duress.").

[which it well may have been if ProTrade was within its rights to reject the shipment from W. Silver], ProTrade will not be able to demonstrate Southern's bad faith. *See Snowville Subdivision Joint Venture Phase I v. Home S. & L. of Youngstown, Ohio*, No. 96675, 2012 WL 1067748, at *6 (Ohio Ct. App. Mar. 29, 2012) ("Ohio courts have repeatedly held that 'a lender does not act in "bad faith" [as defined by the UCC] when it decides to enforce its contract rights.'"); *Flynt Eng'g Co. v. Cox*, 99 S.W.3d 99, 101-02 (Tenn. Ct. App. 2002) ("the assertion of an intention . . . to do what one has a legal right to do is insufficient to create duress."). But this resolution is for another day.

In summary, viewing the allegations of the Third-Party Complaint in ProTrade's favor (as required at this stage), and disregarding Southern's assertions that are inconsistent with such a view (as also required at this state), the Court finds that ProTrade has stated a claim for breach of the 8/29 Sale Contract and pleaded facts sufficient to render the 11/1 Sale Contract a nullity. Thus, ProTrade's claim for breach of contract survives, and Southern's Motion as to this claim will be denied.

### III.    Equitable Indemnity[13]

A right to indemnity "exists whenever one party is exposed to liability by the action of another who, in law or equity, should make good the loss of the other." *Hindmon v. Jones*, No. E200700670COAR3CV, 2008 WL 2557373, at *7 (Tenn. Ct. App. June 27, 2008) (citing 41 Am. Jur. 2d Indemnity § 25 (1968)). "Indemnity generally arises from an express or implied contract.

---

[13] The Court is not sure a theory of equitable indemnity even applies here. Although of course Southern could conceivably be liable for breach of the Southern-ProTrade contract, the Court is having a hard time understanding how Southern could conceivably be liable for ProTrade's alleged breach of contract with *W. Silver*. *See* Fed. R. Civ. P. 14(a)(1) ("A defending party may, as a third-party plaintiff, serve a summons and complaint on a nonparty who is or may be *liable to it for all or part of the claim against it*.") (emphasis added). But Southern does not argue that the equitable indemnity theory is inapplicable here as a matter of law, so the Court will not address its applicability (or lack thereof).

The right to indemnity may, however, arise in the absence of an agreement and by operation of law to prevent an unjust result." *Velsicol Chemical Corp. v. Rowe*, 543 S.W.2d 337, 339 (Tenn. 1976); *see also Travelers Indemnity Co. v. Trowbridge*, 321 N.E.2d 787, 789 (Ohio 1975) ("Indemnity, . . . arises from contract, express or implied, and is a right of a person who has been compelled to pay what another should pay in full to require complete reimbursement."). Indemnity may be implied[14] "where the party from whom indemnity is sought breached a contract or engaged in tortious conduct in performance of contract obligations." *Siegal-Robert, Inc. v. United Inventory Services, Inc.*, No. 07-1206, 2008 WL 11320194, at *2 (W.D. Tenn. Oct. 14, 2008) (citing *Winter v. Smith*, 914 S.W.2d 527, 542 (Tenn. Ct. App. 1995)). "In particular, implied contractual indemnity may be claimed where a breach by the indemnitor of its contract with the indemnitee caused the latter to be subject to a liability for a breach of contract with a third party." *Id.* at *3 (W.D. Tenn. Oct. 14, 2008) (citing *Stiver Mktg., Inc. v. Performance Bus. Forms*, *Inc.*, No. 01-A-01-9108CH00276, 1991 WL 254564, at *4 (Tenn. Ct. App. Dec. 4, 1991)).

Southern argues that ProTrade's equitable indemnity claim should be dismissed because under Tennessee law, any claim for "equitable indemnity does not exist until the claimant has paid the liability for which he seeks." (Doc. No. 23 at 8 (citing *Trammel v. Appalachian Elec. Coop.*, 135 F. Supp. 512, 515 (E.D. Tenn. 1955); *Fontenot v. Roach*, 120 F. Supp. 788, 790 (E.D. Tenn. 1954)). In response, ProTrade argues that the "timing of a party's filing of a third-party complaint is a procedural issue, subject to federal law." (Doc. No. 27 at 5). ProTrade cites *Huggins v. Graves*, 210 F. Supp. 98 (E.D. Tenn. 1962) in support, which expressly rejected *Trammel* and *Fontenot* (the cases relied on by Defendant) because:

---

[14] Although ProTrade refers to its claim as one for "equitable indemnity," Tennessee courts more commonly use the term "implied indemnity" to refer to such a claim. *See Velsicol Chemical Corp.*, 543 S.W.2d at 339.

> the timing or sequence of the contribution action is procedural and therefore governed in Federal Court by the Federal rules relating to third-party practice . . . Rule 14 of the Federal Rules of Civil Procedure . . . seems to contemplate just such third-party proceedings when it permits a third-party action against one who "is or may be liable."

210 F. Supp. at 106 (citing Fed. R. Civ. P. 14). The Court agrees with ProTrade that the issue raised by Southern is one of procedural law, and thus, governed by the Federal Rules of Civil Procedure. Therefore, as did the court in *Huggins*, the Court respectfully diverges from the analysis of the courts cited by Southern.

The plain language of Rule 14(a) approves of third-party complaints naming defendants against whom claims have not yet accrued, because the rule permits the service of third-party complaints "on a party who is or *may be* liable to it for all or part of the claim against it." (emphasis added); *see Am. Zurich Ins. Co. v. Cooper Tire & Rubber Co.*, 512 F.3d 800, 805 (6th Cir. 2008) ("The purpose of Rule 14 is to permit additional parties whose rights may be affected by the decision in the original action to be joined so as to expedite the final determination of the rights and liabilities of all the interested parties in one suit."); *see also Discovery Group, LLC v. Chapel Dev., LLC*, 574 F.3d 986, 989 (8th Cir. 2009) ("[The] cause of action for indemnity was not premature, even though it had not yet accrued when their third-party complaint was filed. Federal Rule of Civil Procedure 14 allows a defendant to implead another party 'who is or may be liable' to the defendant for all or part of the plaintiff's claim.").

Numerous other district courts have applied Rule 14 and upheld the addition of indemnification claims brought under Tennessee or Ohio law before a final judgment is reached in the underlying litigation. *See AutoZone, Inc. v. Glidden Co.*, 737 F. Supp. 2d 936, 943–45 (W.D. Tenn. 2010); *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, No. C80-1733, 1982 WL 1828, at *2 (N.D. Ohio Feb. 2, 1982), *aff'd*, 196 F.3d 617 (6th Cir. 1999) ("[W]here state law creates a right

to indemnity, a defendant seeking indemnification may implead the party he alleges to be primarily liable before the plaintiff successfully obtains a judgment[.]"); *Siegel-Robert*, 2008 WL 11320194, at *3.

Therefore, the Court finds that Plaintiff's indemnity action is not premature. Southern offers no other argument explaining why the indemnity claim should be dismissed. Because the Court found that ProTrade's breach of contract claim survives Southern's motion to dismiss, its equitable indemnity claim may proceed as well. *See Johnson v. Songwriter Collective, LLC*, No. 3:05-0320, 2006 WL 2524094, at *5 (M.D. Tenn. Aug. 30, 2006) ("Having pled sufficient facts to support its separate claim for breach of contract against [the third-party defendant], the Court finds that [the third-party plaintiff's] companion indemnity claim may proceed as well."). Consequently, Southern's motion to dismiss this claim will be denied.

## CONCLUSION

For the foregoing reasons, Southern's Motion to Dismiss the Third-Party Complaint (Doc. No. 22) will be **DENIED**.

An appropriate Order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE