IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

W. SILVER RECYCLING, INC.,       )
                                   )
      Plaintiff,              )
                                   )   NO.  3:18-cv-00710
v.                                )
                                 )   JUDGE RICHARDSON
PROTRADE STEEL COMPANY, LTD.,   )
                                 )
      Defendant.           )

## MEMORANDUM OPINION

Before the Court is Defendant ProTrade Steel Company, LTD ("ProTrade")'s Motion for Summary Judgment (Doc. No. 57, "Motion"), supported by an accompanying brief (Doc. No. 58). Plaintiff W. Silver Recycling, Inc. ("Silver") filed a response (Doc. No. 63), and ProTrade replied (Doc. No. 65). For the reasons stated below, ProTrade's Motion will be granted in part and denied in part.

## UNDISPUTED FACTS[1]

ProTrade is an Ohio Limited Liability Company with its principal place of business in Ohio. (Doc. No. 64 at ¶ 1). Silver is a Texas corporation with its principal place of business in Texas. (*Id*. at ¶ 2). Silver and ProTrade's businesses both involve, among other things, the buying and selling of scrap metal recycling materials. (*Id*. at ¶ 3).

In August 2017, Silver and ProTrade began negotiations regarding the possible sale (by Silver to ProTrade) of a barge loaded with approximately 1,300 tons of scrap metal through their

---

[1] The following facts are deemed to be undisputed by the parties and are gleaned from Silver's Response to ProTrade's Statement of Undisputed Facts (Doc. No. 64), or from email communications between the parties that are attached as exhibits by ProTrade and the authenticity of which is not contested by Silver.

1

respective agents, Patrick Merrick and Mitch Robertson. (*Id*. at ¶¶ 6, 8).[2] The material had been previously shipped by Silver to a potential buyer (SSAB) in Mobile, Alabama, and SSAB rejected the shipment for containing "oversized" material. (*Id*. at ¶ 7).[3] After engaging in numerous oral conversations with each other regarding the sale of the materials on the barge, Merrick and Robertson participated in the following text message exchange on August 25, 2017:

> Robertson: If buy it at $330 gtsp and we will pay the freight.
> Robertson: Ill^*
> Merrick: $335
> Robertson: Yes
> Robertson: Deal?
> Merrick: Ok, let's do it.
> Robertson: Done tks
> Robertson: Will send info Monday
> Merrick: Confirm email later

(*Id*. at ¶ 10). Later that day, Merrick send the following email to Robertson:

> As discussed, we'll confirm this rejected barge at $335/gt as-is fob Mobile, AL. Please send info. on Monday AM and we'll get this billed to you and set you up with the barge line.

---

[2] As to ProTrade's assertion that "In August 2017, Silver and ProTrade began negotiations regarding the possible sale of a barge loaded with approximately one thousand three hundred tons of scrap metal," Silver responded, "[d]enied as stated." (*Id*. at ¶ 6). Silver then explains the basis of its denial as follows:

> Shortly after SSAB rejected Barge # AEP 7232, Merrick informed Robertson about the barge, specifically telling him that it contained previously rejected long stringers and was being sold "as is" and sending him copies of the photographs of the barge and its contents. On August 23, 2017, after confirming that the reason the barge was rejected by SSAB was oversized stringers, Robertson texted Merrick to say "I'm interested in buying the barge from you." From the outset, Silver sought to sell (and ProTrade agreed to buy) one, specific, previously-rejected barge (Barge AEP # 7232).

(*Id*. (citations to the record omitted)). Although Silver provides more details regarding the circumstances of the discussions that were occurring in its Response to ProTrade's Statement of Undisputed Facts, these details do not truly dispute the general notion that the parties were in fact negotiating the sale of the materials loaded on the barge. Thus, the Court does not see the basis to dispute ProTrade's assertion here "as [it was] stated." Accordingly, the Court will not treat the statement as denied.

[3] As with the assertion of fact discussed in the previous footnote, Silver takes issue with this statement and contends it is "disputed as stated." Although Silver offers more details regarding the statement in their explanation, Silver does not in fact dispute this general statement. Thus, the Court does not see the basis to dispute ProTrade's assertion here "as [it was] stated." Accordingly, the Court will not treat the statement as denied.

(*Id*. at ¶ 11).[4] This email is the first known email or text message to include the phrase "as is." (*Id*. at ¶ 12). On Monday, August 28, 2017, Robertson forwarded Merrick's e-mail to ProTrade's purchasing department, copying Merrick and stating that ProTrade "recently agreed to purchase a barge from W. Silver located in Mobile, Al." (*Id*. at ¶ 13 (citing Doc. No. 59-5 at 1)). The next day, Candy Johnson, an employee of ProTrade, responded to the email (with Merrick again copied), stating that she was preparing a Purchase Order and asking Robertson to "[l]et [her] know what else [he] want[s] typed up on the contract." (*Id*. at ¶ 16).

Thereafter, ProTrade emailed Merrick a document titled "Purchase Contract" and dated August 29, 2019. (*Id*. at ¶ 17). The Purchase Contract provided that ProTrade would purchase from Silver 1,350 gross tons of mill busheling at the price of $335 per gross ton. (*Id*. at ¶ 18; Doc. No. 59-6). The Purchase Contract also provided:

> Consumer weights, grading & specifications to govern. Shupment [sic] from Seller's own yard unless otherwise stated herein. . . . This purchase is subject to ProTrade Steel Company, Ltd. ("ProTrade") Terms and Conditions of Purchase effective on the date of purchase by ProTrade, which are incorporated in full by this reference. The Terms and Conditions of Purchase are available at http://www.protradesteel.com/purchase-terms-conditions and also will be provided to Seller upon request. ProTrade limits this purchase to ProTrade's Terms and Conditions of Purchase and objects to any other additional or different terms in the Seller's sales order or acknowledgement.

(Doc. No. 59-6; Doc. No. 63 at ¶ 21). On August 29, 2017, ProTrade's Terms and Conditions of Purchase, which were available on its website at the referenced URL, contained the following language:

> **8. Rejected Materials.** All Material shall be received subject to the acceptance of the ultimate consumer, with the weights and grading of that consumer to govern. Rejected Material remains Seller's property at its risk and subject to its disposition. Rejected shipments are to be replaced at ProTrade's option.

> **9. Termination and Cancellation.** *In the event of nonconformity, nondelivery, partial delivery, or late delivery* of the quantity specified in this Contract, ProTrade

---
[4] The term "gt" is an abbreviation for "gross tons."

3

may at its option (i) cancel this Contract, (ii) replace the Material, in the open market after due notice and within a commercially reasonable time and recover from Seller the difference between the market price of the Material at the time of replacement and the contract price, and (iii) obtain any other remedy or relief provided by law including, but not limited to, the right to a setoff against any amount Seller is due from ProTrade or its affiliate companies on any purchase contract or otherwise, provided, however, that written notice of such nonconformity, nondelivery, partial delivery, or later delivery is provided to Seller.

(Doc. No. 63 at ¶ 22). ProTrade's Terms and Conditions also include an anti-amendment and merger clause

limiting the ability of Silver, or any other party, to modify the terms of the Purchase Contract: No waiver, alteration or modification of the terms of this contract as herein set forth, nor any understanding or agreements not set forth herein shall be valid and binding upon ProTrade unless made in writing and signed by a duly authorized representative of ProTrade.

(*Id*. at ¶ 26). On August 29, 2017, Silver sent ProTrade an invoice containing price and quantity terms, a total amount owed ($436,259.73), and a specific reference to Barge AEP # 7232. (*Id*. at ¶¶ 23, 24).

A month later, on September 29, 2017, Robertson emailed Merrick to inform him that Southern Recycling (ProTrade's customer to whom it planned to sell the contents of the barge, hereinafter "Southern") was offloading the barge and believed there to be nonconforming materials. (Doc. No. 63-1 at 2). On October 13, 2017, Robertson emailed Merrick to inform him that ProTrade supported Southern's decision to reject the contents of the barge and to suggest three options for Silver: (1) return the barge to Silver's facility in Texas at Silver's cost, (2) accept a reduced price of $265/gross ton, less $23/gross ton for freight from Mobile, Alabama to Clarksville, Tennessee, or (3) pay Southern $70/gross ton to offload, process, and store the material until Silver could re-sell the material elsewhere. (*Id*. at 7). Silver rejected each of these options, and Merrick emailed Robertson noting that "it is unfortunate that you are attempting to withdraw from your agreement to purchase the barge as-is." (*Id*. at 6). Nonetheless, Merrick suggested that

4

in order to mitigate the demurrage costs that were accruing daily, Southern unload the barge at its facility. (*Id.*).

On October 16, 2017, ProTrade informed Silver that it was selling the materials at a reduced price to Southern and that "W Silver will be paid $265/gt dlvd Clarksville TN, less freight and demurrage from Mobile AL." (Doc. No. 64 at ¶ 32). Thereafter, ProTrade paid Silver $272,091.24 for the contents of the barge. (*Id.* at ¶ 33).

On July 31, 2018, Silver filed this action against ProTrade, alleging that Silver is entitled to $164,168.49 (the difference between the total amount owed if the materials were sold for $335 per gross ton and the reduced amount of $265 per gross ton that ProTrade paid Silver) allegedly owed by ProTrade, plus interest, as well as the cost to deliver the barge to Clarksville. (Doc. No. 1). On November 27, 2019, ProTrade filed the instant Motion, wherein it moved for summary judgment as to each of Silver's four claims. (Doc. No. 57). The Motion is now ripe for adjudication.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

5

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628.

A party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

ANALYSIS

Silver brings four claims against ProTrade: (1) breach of contract; (2) breach of implied contract; (3) negligent misrepresentation; and (4) unjust enrichment. (*Id*.). The Court will explore whether ProTrade is entitled to summary judgment on each of these claims in turn.

**1. Choice of Law**

Before delving into the merits of the claims, the Court will briefly discuss which state's law applies to Silver's claim. "Because jurisdiction in this case is based upon diversity of citizenship, state law governs matters of substance while federal law dictates procedural issues." *In re American Casualty Co*., 851 F.2d 794, 798 (6th Cir. 1988) (citations omitted). So as to substantive matters, the Court must determine which state's law governs.[5]

As for the breach-of-contract claim, the parties agree that the distinction between Tennessee or Ohio law (the Purchase Contract's Terms and Conditions contained a choice-of-law clause choosing Ohio law) is one without a difference. The Uniform Commercial Code ("UCC") governs this claim, as the parties agree,[6] and as Defendant puts it,

> In any choice of law analysis, the "first step is to decide whether a conflict actually exists between the relevant laws of the different jurisdictions." [*Boswell v. RFD-TV the Theater, LLC*, 498 S.W.3d 550, 555 (Tenn. Ct. App. 2016).] The contract at issue is quite obviously one for the sale of goods, to which the [UCC] applies. . . . Tennessee, Texas, and Ohio have all enacted identical relevant provisions of the [UCC], which applies to this transaction.

---

[5] A federal court sitting in diversity must apply the choice-of-law rules of the forum state, in this case, Tennessee. *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009).

[6] The parties' agreement is governed by the UCC, as adopted in Ohio and Tennessee, because the sale of scrap metal is considered a transaction in goods. *See Iverson Indus., Inc. v. Metal Mgmt. Ohio, Inc.*, 525 F. Supp. 2d 911, 917 (E.D. Mich. 2007) ("The parties' transactions in scrap metal is nothing more than a sale of goods, which in Michigan is governed by Article 2 of the Uniform Commercial Code."); *Am. Iron & Metal Co. v. U.S. Ferrous Trading Div., Tube City Div., Tube City IMS*, No. 306CV01538PCD, 2007 WL 1125682, at *3 (D. Conn. Apr. 16, 2007) (noting that the "scrap-metal transaction was a sale of goods . . . . Therefore, the transaction is subject to the Connecticut U.C.C.").

7

(Doc. No. 58 at 7). Plaintiff agrees that "there does not appear to be any material distinction between the Ohio and Tennessee provisions of the [UCC] at issue in this case." (Doc. No. 63 at 11 n.6).

The Court agrees with the parties that it appears that Tennessee's and Ohio's respective applicable UCC provisions are the exactly the same. *Compare* Tenn. Code Ann. § 47-2-207 *with* Ohio Rev. Code § 1302.10. And the Court does not perceive that relevant Tennessee case law differs from relevant Ohio case law. *See Nat'l Bankers Tr. Corp. v. Total Quality Logistics, LLC*, No. 12-CV-02208-TMP, 2013 WL 12100719, at *5 (W.D. Tenn. Sept. 30, 2013) ("[T]he court is not aware of any material distinction in the case law interpreting Ohio or Tennessee law on contracts or the U.C.C."). Further, the Court agrees that the parties' choice to apply Tennessee law to the breach-of-contract claim is a reasonable one. Pursuant to Tennessee's version of the UCC, in the absence of a choice of law provision, "Tennessee's [UCC] applies 'to transactions bearing an appropriate relation to the state of Tennessee.'" *Carbon Processing and Reclamation, LLC v. Valero Mktg. and Supply Co.*, 823 F. Supp. 2d 786, 801 (W.D. Tenn. 2011) (quoting Tenn. Code Ann. § 47-1-301(b)). Because a significant portion of the transaction was performed in Tennessee,[7] (*i.e.*, the goods were delivered in Tennessee), the parties' agreement bears an appropriate relation to Tennessee. Therefore, the Court will cite to Tennessee statutes and case law in this Memorandum Opinion when discussing the breach-of-contract claim.[8]

As to Plaintiff's remaining claims, the parties appear not to dispute that Tennessee law applies to these claims, as both cite to Tennessee law in their briefs when discussing these claims.

---

[7] A jurisdiction bears a reasonable relation "where a significant enough portion of the making or performance of the contract is to occur or occurs." Tenn. Code Ann. § 47-1-301 cmt. 1.

[8] To the extent that Ohio case law interpreting the applicable UCC provisions would favor a party in this case to a greater extent than would Tennessee case law, the party can hardly object, having assented to the application of Tennessee case law.

8

In any event, the Court independently concludes that Tennessee law does apply to these claims. Tennessee has adopted the "most significant relationship" test of the Restatement (Second) of Conflict of Laws. When considering the circumstances in totality, the Court perceives that Tennessee does have the most significant relationship to this litigation; thus, the Court will apply Tennessee law when addressing Counts II through IV.

## 2. Count I: Breach of Contract

The UCC does not alter the common-law definition of breach of contract. *See Orlowski v. Bates*, 146 F. Supp. 3d 908, 923 (W.D. Tenn. 2015) (citing the elements of a common law contract claim when analyzing a breach-of-contract claim involving the sale of goods). Under Tennessee law, the elements for a breach-of-contract claim are: (1) the existence of an enforceable contract; (2) nonperformance amounting to breach of the contract; and (3) damages caused by the breach of contract. *See ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005). The UCC prescribes that "[t]he obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." Tenn. Code Ann. § 47-2-301. Thus, the failure of either party to satisfy this obligation constitutes a nonperformance amounting to a breach of contract.

In this case, neither party disputes that a contract between the parties existed. The dispute is, therefore, not over the existence of a contract, but over the nature of its terms. To determine the terms of the parties' contract, the Court turns to Tennessee Code Annotated section 47-2-207, which illuminates the Court's determination of the terms to which the parties are legally deemed to have agreed. That statute provides in pertinent part:

Additional terms in acceptance or confirmation

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it

9

states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Tenn. Code Ann. § 47-2-207. Comment 3 states,

Whether or not additional or different terms will become part of the agreement depends upon the provisions of subsection (2). If they are such as materially to alter the original bargain, they will not be included unless expressly agreed to by the other party. If, however, they are terms which would not so change the bargain they will be incorporated unless notice of objection to them has already been given or is given within a reasonable time.

Tenn. Code Ann. § 47-2-207 cmt. 3. "The issue of whether a term materially alters the contract . . . is a question of fact that must be determined in light of the facts of the case and the parties' expectations." *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 7 F. Supp. 2d 954, 965 (N.D. Ohio 1998)[9] (quoting *Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d 758, 765 (10th Cir. 1983)); *see also Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, n.8 (6th Cir. 1972) ("we believe the question of material alteration necessarily rests on the facts of each case."). This statute and these principles are essential to analyzing how the contract was formed, and what its terms were given how it was formed—the key question to which the Court now turns.

Merrick, as a representative of Silver, sent the following email on August 25, 2017: "As discussed, we'll confirm this rejected barge at $335/gt as-is fob Mobile, AL. Please send info. on

---

[9] The court in *Goodyear* applied Ohio's version of the UCC, which the Court determined above to be indistinguishable to Tennessee's version of the UCC with respect to the issues presently before the Court.

10

Monday AM and we'll get this billed to you and set you up with the barge line." (Doc. No. 64 at ¶ 11). In its Memorandum of Law, ProTrade expounds on its theory that this email is merely an offer by Silver to make a contract, as opposed to a written confirmation that contained the terms of the party's agreement as already formed (*i.e.*, as accepted by ProTrade and not merely offered by Silver).[10] (Doc. No. 58 at 8). Thus, ProTrade contends that its act of sending Silver the Purchase

---

[10] ProTrade argues that the Court cannot consider the August 25 email as a written memorialization of the parties' agreement, because it does not satisfy the statute of frauds. Tennessee's provisions adopting the UCC provide that the statute of frauds is satisfied where both parties are merchants (as ProTrade and Silver undisputedly are) and "within a reasonable time a writing or record in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents . . . unless written notice of objection to its contents is given within ten (10) days after it is received." Tenn. Code Ann. § 47-2-201(2). Comment One to the statute provides that the "writing need not contain all the material terms of the contract . . . . All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." Tenn. Code Ann. § 47-2-201 (Cmt. 1). "The only term which must appear is the quantity term which need not be accurately stated but recovery is limited to the amount stated." *Id.* ProTrade asserts that it is the absence of the quantity term that makes the August 25 email insufficient to satisfy the to the statute of frauds.

The Court need not determine whether ProTrade's particular statute of frauds argument has merit at this juncture, because even construing the August 25 email as an offer, rather than a written memorialization of the parties' agreement, ProTrade has still failed to show the absence of a genuine dispute of material fact. In other words, even if the Court does exactly what ProTrade says is required by the statute of frauds—*i.e.*, refuses to treat the August 25 email as a written memorialization—and thus treats the August 25 email as merely an offer by Silver, that would not help ProTrade. As discussed below, whichever way the August 25 email is treated , ProTrade cannot show the absence of a genuine issue of fact as to whether the additional proposed terms on which it relies actually became part of the parties' contract.

In any event, the Court expresses doubt that any statute of frauds defense would be meritorious, for two main reasons. First, a statute of frauds defense is simply not applicable here, because the parties do not dispute that a contract existed. Courts have described the purpose of the UCC's statute of frauds as "to ensure that the parties did in fact have an agreement[.]" *Eberspaecher N. Am., Inc. v. Nelson Glob. Prod., Inc.*, No. 12-11045, 2012 WL 4356781, at *5 (E.D. Mich. Sept. 23, 2012). Indeed, Tennessee Code Annotated Section 47–2–201(3) provides that a contract "is enforceable [despite lack of a writing] if. . . the party against whom enforcement is sought admits in in his pleading, testimony or otherwise in court that a contract for sale was made . . . ." Here, ProTrade (obviously the party asserting the statute of frauds defense) stated in its Memorandum of Law that "the parties entered into an express, written contract." (Doc. No. 58 at 7). Accordingly, the Court find that a statute of frauds defense is unavailable under the present circumstances, where the party challenging the adequacy of the writing expressly admits in its brief that a contract in fact existed. Relatedly, ProTrade is not here invoking the statute of frauds for a purpose for which it may properly be invoked; it invokes the statute of frauds not to challenge the existence of the contract, but rather to characterize one particular writing as part of a larger effort to show that the contract contains the particular terms on which it relies. ProTrade cites no authority for the very dubious proposition that a party can invoke the statute of frauds not to say that there is not an adequate writing (or writings) to support the existence of the contract, but rather to say that particular terms desired by the party are part of that contract because (in part) one particular writing is insufficient to satisfy the statute of frauds.

Second, even if a statute of frauds defense was applicable to these circumstances, "'to satisfy the statute of frauds, a party may rely on multiple documents evidencing the same transaction, provided that the writings on their face relate to one another.'" *Garland v. Ford Motor Co.*, No. 2:12-00121, 2013 WL 3937017, at *3 (M.D. Tenn. July

Contract operated as an acceptance of Silver's offer. (*Id.*). But it operated to do much more, according to ProTrade; sending Silver the Purchase Contract operated to add, to the terms of the contract formed by ProTrade's acceptance of Silver's offer, a right of ProTrade to reject the materials sold. In so arguing, ProTrade notes that its Terms and Conditions, incorporated into Purchase Contract. ProTrade then contends:

> Here, Silver offered to sell the materials to ProTrade at a specific price. Silver [sic] accepted, in the process proposing additional terms including a right of rejection for the ultimate purchaser, Southern Recycling. This right of rejection is not limited in any way. By operation of T.C.A. § 47-2-207, these terms and conditions became a part of the contract of the parties. ProTrade's invocation of these provisions was not a breach a contract, and Silver cannot prove an essential element of its claim.

(*Id.* at 10).[11] In other words, the right-of-rejection provisions, being incorporated into the Purchase Contract send by ProTrade to accept Silver's offer, supposedly became part of the contract under Tenn. Code Ann. § 47-2-207 because Silver never objected to the additional terms contemplated

---

30, 2013) (quoting *Oliver v. Upton*, No. 01A01-9705-CH-00197, 1998 WL 151388 at *3 (Tenn. Ct. App. April 3, 1998); *see also Mitchell v. Rivergate Acquisitions, Inc.*, No. CIV A 306-CV-0621, 2007 WL 2351317, at *7 (M.D. Tenn. Aug. 15, 2007). And the multiple documents relied upon need not be formal or sophisticated documents. *See Waddle v. Elrod*, 367 S.W.3d 217, 222 (Tenn. 2012) (finding that the parties' various emails satisfied the statute of frauds); *see also CALA Diamonds, LLC v. HRA Grp. Holdings*, No. 17-CV-1136, 2017 WL 4222886, at *12 (E.D. Pa. Sept. 22, 2017) (holding that "the invoices, emails, shipping and promotional materials which are alleged to have been exchanged between the parties[] are, we find, definite enough to reflect the terms of the parties' oral agreements and to in and of themselves constitute a written contract."). A review of the evidence of the parties' correspondence surrounding the August 25 email clearly indicates a precise quantity term. (Doc. No. 63-1 at 13-14 ("1302gt [gross tons]")).

The immediately preceding paragraph actually serves to highlight the fact that ProTrade's argument is not even concerned with whether the statute of frauds is satisfied in this case and thus does not properly invoke the statute of frauds. As noted in that paragraph, the statute of frauds need not be satisfied by a single writing; multiple writings collectively can do the job. But ProTrade's argument admits of no such principle. It asks only whether a single writing (the August 25 email) satisfies the statute of frauds; it is completely irrelevant to ProTrade's argument whether multiple writings satisfy the statute of frauds, because the argument is concerned only with the significance (and characterization) of a single writing. It simply makes no sense, in considering ProTrade's argument as presented by ProTrade, to consider other documents also and ask whether they collectively satisfy the statute of frauds. And when it is irrelevant to an argument whether the statute of frauds can be satisfied by looking at documents beyond the document that is the exclusive focus of the argument, the argument is not truly addressed to whether the statute of frauds is satisfied. And such an argument has not properly invoked the statute of frauds at all.

[11] The Purchase Contract contained Terms and Conditions that included provisions ("right-of-rejection provisions") allowing ProTrade both to reject the materials if not accepted by ProTrade's ultimate consumer and to cancel the contract upon receipt of non-conforming goods. (*see* Doc. No. 63 at ¶ 22).

12

by the Purchase Contract. Accordingly, ProTrade asserts that it was within its legal right to reject the materials on the barge and thus did not breach the contract, meaning that ProTrade is entitled to summary judgment on Silver's breach-of-contract claim. (*Id.*).

Unsurprisingly, Silver disagrees with ProTrade that the Purchase Contract's Terms and Conditions apply. Silver contends that even if the August 25 email was construed as an offer, the Purchase Contract's terms did not automatically become terms to the parties' contract. Silver notes that under Tenn. Code Ann. § 47-2-207, any additional terms stated in an expression of acceptance of an offer—which is what ProTrade's sending of its Purchase Contract, under ProTrade's theory— are merely proposals for additions to the contract and do not become part of the contract if they "'materially alter it' or if 'notification of objection to them has already been given.'" (Doc. No. 63 at 17). And according to Silver, ProTrade's Terms and Conditions materially alter the initial agreement by effectively removing the as-is language.[12] (*Id.* at 17).

In reply, ProTrade argues that even if the Court finds that a binding contract was formed by the August 25 email, "there is still no doubt that the August 29, 2017 Purchase Contract constituted 'a written confirmation . . . sent within a reasonable time . . . and state[ed] terms additional to or different from those offered or agreed upon.'" (Doc. No. 65 at 1 (citing Tenn. Code Ann. § 47-2-207)). Thus, ProTrade contends that the Terms and Conditions of the Purchase Contract became "part of the contract between the parties" because, according to ProTrade, they did not materially alter the initial agreement and were not objected to by Silver. Further, ProTrade

---

[12] Silver also raises two additional arguments: (1) ProTrade's Terms and Conditions did not become part of the parties' agreement, because it (Silver) had previously indicated its objection to the right-of-rejection provisions contained in the Terms and Conditions inasmuch as it had indicated in the August 25 email that it was selling the barge "as-is", (*id.* at 17); and, alternatively, (2) even if the Court were to decide that ProTrade's Terms and Conditions did apply, summary judgment nevertheless would be inappropriate "because genuine issues of material fact exist [as to] whether the contents of Barge AEP # 7232 complied with Southern's weight gradings, and specifications and whether ProTrade had a right to refuse to honor the terms of the parties' agreement," (*id.* at 19). The Court does not express an opinion on the merits of these arguments, finding that Silver's breach-of-contract claim survives summary judgment in any event for the reasons stated herein.

argues that there is no dispute of material fact regarding whether the materials were nonconforming (and thus properly rejected under the Terms and Conditions), because the Terms and Conditions "specifically provide that the 'weights and grading' of the 'ultimate consumer' govern. . . . [and t]he undisputed fact is that the materials were rejected by the ultimate consumer." (*Id*. at 2-3).

The Court need not decide whether the August 25 email was a memorialization of the parties' agreement rather than a mere offer. Whether or not it was, ProTrade's theory requires it to show an absence of genuine issue of material fact as to whether its Terms and Conditions (especially the right-of-rejection provisions) became part of the parties' contract under Tenn. Code Ann. § 47-2-207. ProTrade fails to make this showing, because genuine questions of material fact remain as to whether the right-of-rejection provisions materially altered the parties' contract and thus under Tenn. Code Ann. § 47-2-207 did not become part of the contract.

Here, as explained, ProTrade contends that because the August 25 email does not satisfy the statue of frauds, it was merely an offer, to which ProTrade responded by sending its Purchase Contract, which (under ProTrade's theory) operated as an acceptance of the offer. Alternatively, ProTrade contends that even if its statute of frauds argument is not successful, and the August 25 email itself formed the agreement, such that ProTrade's subsequent sending of the Purchase Contract came too late to constitute the act of accepting an offer to form an agreement, then the Purchase Contract was a written confirmation of the agreement formed by the August 25 email. Under either of ProTrade's alternative contentions, Tenn. Code Ann. § 47-2-207 is applicable to the Purchase Contract (and its incorporated Terms and Conditions, including the right-of-rejection provisions).

Under either of ProTrade's theories, the terms contemplated in the August 25 email were the terms of the contract as originally formed, and the only question is whether ProTrade

14

successfully added to the contract the additional terms (the right-of-rejection provisions) on which it now relies. The right-of-rejection provisions would be considered *proposed* additional terms to the agreement because "additional terms are construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless . . . they materially alter it[.]" Tenn. Code. Ann. §47-2-207(2)(b). The question here is whether these proposed additional terms actually became additional terms of the contract.

As to this question, the Court finds that genuine issues of fact preclude summary judgment on Count One. A reasonable jury could find that the right-of-rejection provisions materially altered the terms reflected in the August 25 email, which were the original terms of the contract under either of ProTrade's alternative contentions. Merrick testified in his deposition the importance to Silver of the as-is provision, stating that provision was included "[f]or both parties' protection and understanding that there was a previous issue with the material that was being sold." (Doc. No. 63-3 at 13). He further explained that Silver wanted to include the as-is provision because he knew the barge contained "unprepared material" that "caused the problem at the first mill" and "we could not afford to have another problem with this [barge]." (*Id*.). Moreover, jurors are allowed to bring their common sense and experience into deliberations—and these things would tell any juror who (like so many Americans, especially in the used car context) has considered buying something "as-is" that this provision is very material indeed. Thus, a reasonable jury could find that the "as-is" provision was a material term of the contract. And a reasonable jury could also find that the right-of-rejection provisions materially altered this material term of the contract by essentially eliminating it; ProTrade did not truly purchase the material "as-is" if ProTrade had the right to cancel the purchase due to its "ultimate consumer" rejecting the materials on the barge. (Doc. No. 63 at ¶ 22). Accordingly, a jury could find that the right-of-rejection provisions "materially

alter[ed] the original bargain."[13] Tenn. Code Ann. § 47-2-207 cmt. 3.[14] And if the right-of-rejection provisions did materially alter the original terms of the contract, they would not become part of the parties' agreement and thus cannot provide the support required for ProTrade to prevail on its Motion with respect to Count One.

In conclusion, ProTrade has not shown an absence of genuine dispute of material fact as to whether or not it breached the parties' agreement by failing to tender Silver the full initially agreed-upon purchase price. Accordingly, viewing the facts most favorably to the non-moving party (*i.e.*, Silver), the breach-of-contract claim survives summary judgment.

### 3. Counts II and IV: Breach of Implied Contract and Unjust Enrichment

ProTrade argues that Silver's breach of implied contract and unjust enrichment claims are subject to summary judgment because a written contract exists that governs the claims. Silver does not respond to this specific argument.

Tennessee courts have noted that "[i]t is a general rule of law that an implied contract or quasi-contract will not be imposed in circumstances where an express contract or agreement exists." *Fletcher Realty, Inc. v. Hayslope Properties*, 712 S.W.2d 478, 481 (Tenn. Ct. App. 1986) (citing 66 Am. Jur. 2d Restitution and Implied Contracts § 6 (1964)); *see also Scipio v. Sony Music Entm't, Inc.*, 173 F. App'x 385, 397 (6th Cir. 2006) ("Defendants wisely do not contend that a

---

[13] Arguing that the provision allowing for inspection by its ultimate consumer does not materially alter the offer, ProTrade relies on Comment 5 of Tennessee Code Annotated section 47-2-207, which provides: "Examples of clauses which involve no element of unreasonable surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given are: . . . in the case of a purchase for sub-sale, providing for inspection by the sub-purchaser[.]" Tenn. Code Ann. § 47-2-207 cmt. 5. Although the Court concedes this general point, it does not believe such guidance applies when the offer explicitly included that the sale would be "as is." It would indeed unreasonably surprise a seller to learn that its contract to sell materials "as is" ended up not being a sale "as is" due to an additional term.

[14] Silver additionally argues that Silver's insistence on the barge being sold as is operated as a "notification of objection [that had] already been given" prior to the sending of the Purchase Contract, thus preventing the rejection provision from becoming part of the parties' agreement. Finding that Silver's argument regarding material alteration defeats ProTrade's summary judgment motion, the Court expresses no opinion on this argument.

16

separate implied-in-fact contract—that is, one implied by the conduct of the parties—constituted an accord and satisfaction. They clearly seek to uphold the Proposed Agreement, a written contract, as an accord and satisfaction[.]"); *Scandlyn v. McDill Columbus Corp.*, 895 S.W.2d 342, 349 (Tenn. Ct. App. 1994) ("'an implied contract or quasi-contract will not be imposed in circumstances where an express contract or agreement exists.'" (quoting *Fletcher Realty, Inc*., 712 S.W.2d at 481 (Tenn. Ct. App. 1986))).

Likewise, "[a] claim for unjust enrichment in Tennessee rests, in part, on the fact that the parties did not have an enforceable contract." *Simpson v. Bicentennial Volunteers*, *Inc*., No. 01A01–9809–CV–00493, 1999 WL 430497, at *2 (Tenn. Ct. App. June 29, 1999). "Courts may impose a contractual obligation under an unjust enrichment theory if there is no contract between the parties or the contract has become unenforceable or invalid, and the defendant will be unjustly enriched unless the court imposes an obligation." *In re Estate of Ross*, No. M2013–02218–COA–R3–CV, 2014 WL 2999576, at *3 (Tenn. Ct. App. June 30, 2014).

Here, the parties do not dispute that a contract existed; instead they dispute the terms of that contract. (*See* Doc. No. 64 at ¶ 11 (Silver describes its email as a contract, specifically "a merchant confirmatory memo, confirming the terms previously agreed upon.")); (Doc. No. 63 at 19 (Silver argues that it "has put forth ample evidence that the parties mutually assented to the terms of the agreement as set forth in [the] August 25 confirmation email.")); (Doc. No. 58 at 7 (ProTrade asserts that "the parties entered into an express, written contract.")). Further, Silver's implied contract theory is based upon the exact same agreement for which the parties both assert that an express agreement (at some point in time) existed. (*See* Doc. No. 63 at 22 (Silver argues that an implied implied-contract should exist for the sale of the same materials if the Court were to find that Silver "failed to put forth evidence of an express contract.")). Accordingly, ProTrade

17

is entitled to summary judgment on Silver's implied contract and unjust enrichment claim. *See Durkin v. MTown Constr., LLC*, No. W201701269COAR3CV, 2018 WL 1304922, at *7 (Tenn. Ct. App. Mar. 13, 2018) ("'No matter what terms are used to describe the purely equitable remedy provided by quasi contract implied in law, quantum meruit and unjust enrichment, this equitable remedy is generally not available if a valid and enforceable written contract governs the subject matter in issue between the parties.'" (quoting *Ridgelake Apartments v. Harpeth Valley Utils. Dist. of Davidson & Williamson Ctys.*, No. M2003–02485–COA–R3–CV, 2005 WL 831594, at *9 (Tenn. Ct. App. Apr. 8, 2005))). Therefore, summary judgment will be granted to ProTrade on Silver's implied-contract claim and unjust enrichment claim due to the undisputed existence of an agreement between the parties.

**4. Count III: Negligent Misrepresentation**

To prove a negligent misrepresentation claim, the plaintiff must show: (1) the defendant was acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; (2) the defendant supplied faulty information meant to guide others in their business transactions; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relied upon the information. *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997). Under Tennessee law, to support a claim of negligent misrepresentation, the faulty information must "consist of a statement of a material past or present fact." *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982). Consequently, "statements of opinion or intention are not actionable," and "representations concerning future events are not actionable even though they may later prove to be false." *Id.* (citations omitted); *see also Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 (Tenn. 1978) ("[T]he rule established by the cases in this state has been that a

misrepresentation of intention or a promise without intent to perform is legally insufficient to support a claim for rescission or damages."). Silver's claim fails because it has not adduced record evidence that demonstrates ProTrade supplied "faulty information."

Silver contends that ProTrade made three false statements that support its negligent misrepresentation claim: "(1) ProTrade would pay Silver $335/gt for Barge AEP # 7232, (2) Silver would be selling the barge directly to ProTrade, and (3) that ProTrade agreed to purchase the barge as-is." (Doc. No. 63 at 24). Each of these statements is merely a statement of *intention or representations of future events*, not present or past facts. Accordingly, these purported statements do not support a claim for negligent misrepresentation. *See Almanza v. Baird Tree Serv. Co.*, No. 3:10-CV-311, 2012 WL 4758276, at *9 (E.D. Tenn. Oct. 5, 2012) (granting summary judgment on the negligent misrepresentation claim brought pursuant to Tennessee law because the defendant's statement that he "would ensure compliance" involved future action and intention); *Orea Energy Grp., LLC v. E. Tennessee Consultants, Inc.*, No. 3:09-CV-041, 2009 WL 3246853, at *3 (E.D. Tenn. Oct. 6, 2009) (holding that the defendant's "representations and assurances" that it would provide under the contract would not support claim of negligent misrepresentation under Tennessee law because it was a statement of future intent); *Hood Land Tr. v. Hastings*, No. M200902625COAR3CV, 2010 WL 3928647, at *8 (Tenn. Ct. App. Oct. 5, 2010) ("[The defendant's] alleged statements concerning his intention to buy the Hood property cannot, as a matter of law, make out a claim for negligent misrepresentation. There is no statement of material fact alleged.").

Moreover, another requirement for any misrepresentation claim is that the statements at issue must be false (*i.e.*, faulty) when made. *See Homestead Grp., LLC v. Bank of Tenn.*, 307 S.W.3d 746, 751 (Tenn. Ct. App. 2009) (requiring as an element of negligent misrepresentation

19

that the defendant supplied *false* information to the plaintiff); *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 752 (6th Cir. 2014) (explaining that under Tennessee law, a negligent misrepresentation claim requires "that the defendant made a false statement of material fact that is designed to induce the plaintiff to rely on it."). Plaintiff has adduced no record evidence to demonstrate that these statements were false when made: "(1) ProTrade would pay Silver $335/gt for Barge AEP # 7232, [and] (2) Silver would be selling the barge directly to ProTrade[.]" (Doc. No. 63 at 24). Moreover, ProTrade points to the fact that it issued a Purchase Contract, wherein it agreed to purchase the materials at $335 per gross ton and indicated itself (rather than a third party) as the purchaser. This fact affirmatively suggests that ProTrade's intention as represented in these two statements was genuine, such that the statements were not false when made and thus did not provide "faulty information" as required to support a negligent misrepresentation claim in any event. *See Little v. Keystone Continuum, LLC*, No. 3:07-0241, 2008 WL 2901854, at *7 (M.D. Tenn. July 22, 2008) (dismissing a negligent misrepresentation claim because (1) it was a statement of future intention; and (2) "[t]he plaintiff has not alleged any false statements").

Silver also argues that ProTrade's negligent failure to disclose information to Silver "regarding the identity of, and specifications purportedly applicable to/required by, ProTrade's intended end-consumer (Southern) is certainly the type of material fact capable of giving rise to a negligent misrepresentation claim when not disclosed." (Doc. No. 63 at 24). This argument is without merit. Tennessee courts have held that a nondisclosure may form the basis of a negligent misrepresentation claim only in very limited circumstances:

> 1. Where there is a previous definite fiduciary relation between the parties. 2. Where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other. 3. Where the contract or transaction is intrinsically fiduciary and calls for perfect good faith. The contract of insurance is an example of this last class.

20

*Sears v. Gregory*, 146 S.W.3d 610, 617 (Tenn. Ct. App. 2004). None of these circumstances are present here.

Thus, ProTrade has demonstrated an absence of a genuine issue of material fact regarding Silver's negligent misrepresentation claim; therefore, the burden shifted to Silver to raise a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Silver failed to do so. *See* Fed. R. Civ. P. 56(c)(4). Given the arms'-length relationship between the parties, Silver had no chance to, and did not, discharge that burden. Accordingly, ProTrade is entitled to summary judgment on Silver's negligent misrepresentation claim.

CONCLUSION

For the above-mentioned reasons, ProTrade's Motion for Summary Judgment (Doc. No. 57) will be granted in part and denied in part. Silver's breach-of-contract claim (Count I) will proceed to trial. Summary judgment will be granted as to Silver's remaining claims (Count II-IV).

An appropriate order will be entered.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE